## United States District Court
## For The District of Idaho

HUNTSMAN ADVANCED MATERIALS, )
LLC, )
       )
       )
      Plaintiff, )
       )
vs. )       Case No. 08-229
       )
ONEBEACON AMERICA INSURANCE )
CO and SPARTA INSURANCE CO, )
formerly known as AMERICAN )
EMPLOYERS' INSURANCE CO, )
       )
      Defendants. )

### ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN PART, DENYING IT IN PART, AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff Huntsman Advanced Materials, LLC's

(Huntsman) motion for partial summary judgment regarding OneBeacon America Insurance

Company's (OneBeacon) duty to defend Huntsman pursuant to a commercial general liability

insurance policy. Also before the Court are OneBeacon's motion to certify questions of state law

to the Idaho Supreme Court and cross-motion for summary judgment. Having considered the

briefs, record, and relevant case law, having heard oral argument, and otherwise being fully

advised, the Court FINDS and ORDERS as follows:

## BACKGROUND

El Paso Products Company and El Paso Natural Gas Products Company (El Paso) operated the North Maybe Mine from 1964-1972 on land leased from the federal government. El Paso insured its operations by purchasing comprehensive general liability insurance policies (CGL) from American Employers' Insurance Company (American Employers), which is now known as Sparta Insurance Company. The policies each covered one year; El Paso renewed the policies every year until 1972, when it began purchasing insurance from another company. Huntsman is the successor in El Paso's leasehold interest in the North Maybe Mine. It is also the successor in interest to El Paso's insurance policies, which are now administered by OneBeacon.

The insurance policies issued before 1967 require OneBeacon to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss thereof, caused by accident." (ECF 42, Decl. Jay Spillet, Ex. 4, 2.) "With respect to such insurance as is afforded by [the] policy," OneBeacon must "defend any suit against the insured . . . even if such suit is groundless, false, or fraudulent." *Id.* In the event of such a suit, Huntsman must "immediately forward to the company every demand, notice, summons, or other process received." *Id.* at 5. The policy covers only accidents that occurred during the policy period. *Id.* at 2.

The post-1966 policies are similar. They require OneBeacon to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay" because of property

2

damage "caused by an occurrence." (ECF 42, Decl. Jay Spillet, Ex. 5, 1.) The policy defines "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at 2. The policy further provides that OneBeacon shall have "the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage," even if the suit is groundless, false, or fraudulent. *Id.* at 1-3.

On February 27, 2004, the United States Forest Service identified Huntsman as a party potentially responsible for the release of hazardous substances at the North Maybe Mine site. The Forest Service and State of Idaho allege that when El Paso began mining the site in 1965 it deposited waste water containing hazardous substances in dumps to the west of the site. Later, in 1993, waste rock was removed from the mine site and placed in overburden dumps on the east and west boundaries of the site. The Forest Service and State of Idaho allege that the waste water dumps have been contaminating the site since possibly as early as 1965 and that the overburden dumps have been contaminating the site since their creation. The contamination is allegedly ongoing. (ECF 58, Mem. of Points and Authorities in Supp. of Defs.' Mot. for Summ. J. 10) (citing Aff. of Huntsman expert Dave Bunte, PE, Bond Decl. ¶ 7, Ex. 2, p. 7 at ¶11).

On January 21, 2005, (almost a year after it received the PRP letter) Huntsman sent a letter to American Employers via certified mail, notifying the insurance company that the Forest Service had identified Huntsman as a PRP. The letter states:

To Whom it May Concern:

> We the insured, Huntsman Polymers Corporation (f/k/a Rexene Corporation, f/k/a El Paso Products Co.), hereby submit the enclosed environmental claim notification. By letter dated February 27, 2004, the U.S. Forest Service gave notice to Polymers that Polymers is considered to be a potentially responsible party under the federal Superfund for the release of hazardous substances at the North Maybe Mine located about 13 miles northeast of Soda Springs, Idaho.
>
> Please direct any requests for clarification or additional information to James Moore, Vice President and Deputy General Counsel, Senior Environmental, Health and Safety Counsel for Huntsman, LLC.

(ECF 42, Decl. Jay Spillett Ex. 9). The letter identified Huntsman's policies and included an attachment that set out similar information.

OneBeacon received the letter, *id.* at Ex. 9, 3, but failed to forward it to its third-party claim management service, Resolute Management Company (Resolute). As a result, OneBeacon did not immediately assume Huntsman's defense. For reasons that are unclear, Huntsman made no efforts to clarify the status of its claim until May of 2007, when it approached Resolute claim manager Evelyn Riley. In a series of emails spanning from May 11, 2007 to June 13, 2007, Resolute requested information from Huntsman, including a copy of the Forest Service's PRP notification letter and the January 21, 2005 letter from Huntsman to American Employers. . (ECF 42, Decl. Jay Spillett Ex 10.) Huntsman sent OneBeacon the PRP letter on or about August 31, 2007.

On December 18, 2007, OneBeacon denied Huntsman's claim. OneBeacon took the position that Texas law governed and that in Texas, property damage is said to "occur" when the damage becomes readily apparent. Under this view, because the Forest Service did not discover

4

the damage to the North Maybe Mine Site until 2004, the alleged damage would have occurred outside Huntsman's policy periods and there would have been no coverage. However, after the Texas Supreme Court discarded this rule and adopted an injury in fact rule (which holds that property damage "occurs" at the time of the contamination, regardless of when it is discovered), OneBeacon agreed to defend Huntsman under a reservation of rights.[1]

On November 26, 2008, having received verbal notice that OneBeacon had changed its position on coverage, Huntsman gathered invoices relating to defense costs incurred between its 2004 receipt of the PRP notification and OneBeacon's 2008 assumption of Huntsman's defense. Huntsman sought reimbursement for over $500,000 of defense costs. OneBeacon refused to pay in full and this litigation ensued.

Huntsman seeks a declaratory judgment that OneBeacon has a continuing duty to defend that arose on February 24, 2007, when the Forest Service designated Huntsman a PRP. It also seeks reimbursement for all defense costs incurred after its receipt of the PRP letter or, alternatively, reimbursement for all defense costs incurred after January 21, 2005.

In response, OneBeacon maintains that it cannot be liable for defense costs prior to August 31, 2007, when Huntsman "tendered" its defense to OneBeacon by delivering the Forest Service's PRP letter to Resolute. OneBeacon appears to argue that an insured does not "tender"

---

1 Idaho has a "trigger" rule similar to Texas's "injury in fact" approach. *Millers Mut. Fire Ins. Co. of Texas v. Ed Bailey, Inc.*, 647 P.2d 1249, 1251 (Idaho 1982) (noting that an "occurrence" is said to have taken place at the time the policy holder was "actually damaged"). It is not clear why OneBeacon believes Idaho law is beneficial.

its defense to its insurance company unless it sends the insurer an exact copy of the underlying suit papers or unequivocally asks the insurer to assume its defense. Finally, OneBeacon maintains that even if it is liable for defense costs, those costs should be allocated "pro rata" among all of Huntsman's insurance providers. (As a practical matter, that would result in allocating the costs pro rata between the parties, as Huntsman's more recent insurance policies contain applicable exclusions.)

In its cross-motion for summary judgment, OneBeacon argues that it has no duty to defend Huntsman because Huntsman has failed to establish that the environmental contamination occurred during the policy periods. In OneBeacon's view, the insured bears the burden of establishing coverage, and Huntsman cannot meet that burden by relying solely on the Forest Service's allegations in the underlying CERCLA action.

The motions for summary judgment raise three issues: (1) whether Huntsman bears the burden of proving coverage with evidence that property damage occurred during the policy period; (2) when OneBeacon became legally obligated to defend Huntsman and when OneBeacon became contractually liable for defense costs; and (3) if Huntsman is entitled to reimbursement for defense costs, whether OneBeacon is required to allocate those costs on a "pro rata" or "all sums" basis. The Court addresses each issue in turn.[2]

---

2 OneBeacon also filed a motion for certification of five state-law issues to the Idaho Supreme Court. After reviewing the motion the Court concludes that certification of the questions posited by OneBeacon is unnecessary. The only issue that might warrant certification is that of allocation. Because the Court declines to decide that issue now, however, it need not certify the

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment bears the initial responsibility of directing the court to the basis for its motion by identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 447 U.S. 317, 323 (1986). Once the movant has met this standard, the burden shifts to the nonmovant to go beyond the pleadings and, by its own evidence, designate specific facts showing there is a genuine issue for trial. *Id.*

## DISCUSSION

### OneBeacon's Motion for Summary Judgment – Burden of Proof

OneBeacon moves for summary judgment on the ground that Huntsman has failed to prove that property damage occurred during the policy period. OneBeacon argues that to survive summary judgment, Huntsman must come forward with evidence supporting a finding that the insurance policies cover the damages alleged in the underlying suit. Relying on *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009), OneBeacon maintains that Huntsman cannot meet this burden by relying exclusively on the Forest Service's allegations in the

---

question. In any event, the decision to certify a question is discretionary. I.A.R. 12.3. OneBeacon's motion for certification, (ECF 92), is DENIED.

underlying CERCLA action.

OneBeacon's view is clearly contradicted by Idaho law. The rule in Idaho is well-established: "the liability insurer's obligation to defend is to be determined by a comparison of the allegations of the [underlying] complaint to the terms of the policy." *Millers Mut. Fire Ins. Co. of Tex. V. Ed Bailey, Inc.*, 647 P.2d 1249, 1252 (1982); *see also Blue Cross of Idaho Health Service, Inc. v. Atlantic Mut. Ins. Co.*, 2011 WL 162283, *17 (D. Idaho 2011) (slip copy) (holding that in determining whether a duty to defend exists the district court need not look beyond the allegations in the underlying complaint). If the allegations in the underlying complaint, "in whole or in part and read broadly, reveal a *potential* for liability that would be covered," the insured must step in and assume the defense. *Exterovich v. City of Kellog*, 80 P.3d 1040, 1042 (Idaho 2003) (emphasis added). "Doubt as to the obligation of an insurer to defend should be resolved in favor of the insured." *Millers Mutual*, 647 P.2d at 1252. (quoting *Pendlebury v. Western Cas. and Sur. Co.*, 406 P.2d 129, 134 (Idaho 1965)).

OneBeacon's misses the distinction between the duty to defend and the duty to indemnify. As this Court has explained, the duty to defend is separate from, unrelated to, and broader than the duty to indemnify. *State of Idaho v. Bunker Hill Co.*, 647 F. Supp. 1064, 1068 (D. Idaho 1986) (quoting *Hirst v. St. Paul Fire & Marine Ins. Co.*, 683 P.2d 440 (Idaho Ct. App. 1984)). Thus, while an insured must prove that the damages for which it seeks indemnification are covered by the policy, it does not need to prove coverage to invoke the insurer's duty to defend.

8

*Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009) is way out in left field.

In *Virtumundo*, the Ninth Circuit affirmed summary judgment in favor of the defendant on the plaintiff's claim that the defendant violated the Washington Commercial Electronic Mail Act. The court reasoned that because the plaintiff's case was unsupported by anything other than the allegations in *his own* complaint, summary judgment was proper. There is no doubt that is correct. Yet in this case Huntsman is not relying on its own allegations to support the merits of its case. It is relying on the Forest Service's allegations in a separate action. That is precisely what Huntsman is required to do by Idaho law. *Virtumundo* does not apply here.

In fact, OneBeacon has its burdens backwards. To the extent "this motion **TESTS** the **EVIDENCE** at **THIS** time in **THIS** litigation in advance of train in **THIS** case, (Defs.' Reply in Supp. Mot. for Summ. J., 2.), it is **ONEBEACON** that must "show that the claim against [Huntsman] cannot be said to fall within the policy's scope of coverage." *Bunker Hill*, 647 F. Supp. at 1068. OneBeacon has not carried this burden. Dr. Leland Mink, OneBeacon's expert witness, indicated that it is "more likely than not" that groundwater contamination observed by the Forest Service did not occur until 1974. (ECF 59, Bond. Decl., Ex. 5, 1.) Even if this is true, the potential for liability remains. The Court stayed the indemnity portion of this case pending completion of the ongoing Remedial Investigation / Feasibility Study, which the Court has found will facilitate a reasoned and fully informed determination of coverage. There remain genuine disputes of material fact bearing on whether the Forest Service's claim cannot be said to fall within the policy's scope of coverage, and OneBeacon's motion for summary judgment is

9

therefore DENIED.[3]

**Huntsman's Motion for Partial Summary Judgment – The Duty to Defend and "Pre-tender Defense Costs"**

### A. Duty to Defend

As set forth above, a liability insurer owes its policy holder a duty to defend if the underlying complaint, "in whole or in part and read broadly, reveal a *potential* for liability that would be covered." *Exterovick v. City of Kellog*, 80 P.3d 1040, 1042 (Idaho 2003) (emphasis added). In the context of CERCLA claims, the Ninth Circuit has held that "the receipt of a PRP notice is the effective commencement of a 'suit' necessitating a legal defense." *Aetna Cas. and Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1517 (9th Cir. 1991) (applying Idaho law). Thus, if the Forest Service's allegations against Huntsman potentially give rise to a covered claim, OneBeacon has a duty to defend.

The insurance policies issued before 1967 require OneBeacon to "pay on behalf of the insured all sums which the insured shall become legally" liable because of "property damage" caused by an accident or occurrence. (ECF 42, Decl. Jay Spillet, Ex. 5, 1.) The policies issued

---

3  In its response to OneBeacon's motion for summary judgment, Huntsman asks the Court to declare that the costs of the Remedial Investigation / Feasibility Study are defense costs, not damages. Huntsman is worried that without such a declaration "the insurer will simply refuse to pay any future expenses, on the theory that any costs incurred by Huntsman during the RI/FS process are not defense costs." (ECF 86, Huntsman's Mem. of Points and Authorities in Opp'n to Defs.' Mot. for Summ J. 9.) Huntsman may be right, but at this point any dispute over RI / FS costs is purely speculative.

after 1967 contain materially identical language. (ECF 42, Decl. Jay Spillet, Ex. 4, 2.) An "occurrence" is "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended." (ECF 42, Decl. Jay Spillet, Ex. 5, 2.)

In Idaho, an accident is said to have "occurred" when the injured person or property was "actually damaged. *Millers Mut. Fire Ins. Co. of Texas v. Ed Bailey, Inc.*, 647 P.2d 1249, 1252 (Idaho 1982) (quoting *Home Mut. Fire Ins. Co. v. Hosfelt*, 233 F. Supp. 368, 370 (D. Conn. 1962)). This common-sense approach serves to prevent parties from "stretch[ing] the scope of 'accident' backward in time to reach the date of the earliest beginning of any prior event which might be regarded as having a causal relation to the" accident that led to the damage. *Id.* Thus, the ultimate question is whether the Forest Service's allegations, read broadly, could potentially lead to proof that environmental contamination actually occurred at the North Maybe mine during the relevant policy periods.

> The undisputed underlying allegations, as summarized by OneBeacon, are:
> The Forest Service and State of Idaho claim that *contamination began at the North Maybe Mine Site when waste rock was first excavated at the Site in 1965* to reach the phosphate ore beneath the rock and the waste water was placed in dumps on the west ridge of the Site. The Forest Service and State of Idaho claim that *contamination continued to occur as operations at the Site continued from 1965-1993*, when waste rock was removed at the Site to reach phosphate ore and placed in dumps on the west ridge and east side of the Site. Huntsman's predecessor, El Paso Products Company, leased the Site [from] 1964-1970, and mined the Site from 1965-1967. The Forest Service and State of Idaho claim that the Site, including the dump sites, continues to be a source of contamination, resulting in ecological and human health risks.

(ECF 58, Mem. of Points and Authorities in Supp. of Defs.' Mot. for Summ. J. 10) (citing Aff. of Huntsman expert Dave Bunte, PE, Bond Decl. ¶ 7, Ex. 2, p. 7 at ¶11) (emphasis added).

The Forest Service's PRF letter and Unilateral Administrative Order for Conduct of Remedial Investigation / Feasibility Study contain similar allegations. (ECF 88, Decl. of K. Michael Fandel in Supp. of Huntsman's Opp'n to Defs.' Mot. for Summ. J., Ex. 1.) The order indicates that the selenium contamination is caused by eroding overburden dumps, created by El Paso Products in the mid-1960s. *Id.* at 8. While the Forest Service has identified specific harms that manifested after the relevant policy periods (such as the death of more than 650 sheep since 1997), it does not foreclose the possibility that contamination began immediately after the overburden piles were created by El Paso.

Environmental contamination allegedly began at the North Maybe Mine as early as 1965. There is a potential that property damage occurred during the relevant policy periods and therefore a duty to defend. The duty to defend arises upon the filing of the underlying complaint. *Construction Management Systems, Inc. v. Assurance Co. of America*, 23 P.3d 142, 144 (Idaho 2001). Accordingly, OneBeacon owes Huntsman a duty to defend against the Forest Service's allegations, and that duty began February 27, 2004. It will continue until a no-coverage determination is made.

## B. Reimbursement for "Pre-Tender Defense Costs."

This is the tricky issue. In essence, OneBeacon disclaims any responsibility for losing Huntsman's January 21, 2005 letter and refuses to pay for any costs incurred before it was

12

absolutely, positively sure its client was seeking a defense. Huntsman asserts that the January 21, 2005 was plainly sufficient to invoke its right to a defense and that was free to defend itself, no matter the cost, while it waited for OneBeacon to pick up the phone. After an exhaustive review of the record and relevant case law, the Court finds that neither party's position is tenable as a matter of law and that genuine disputes of material fact remain.

## 1. Contractual Obligation to Defend

OneBeacon maintains that, regardless when its legal duty to defend arose, its contractual duty to pay for that defense did not arise prior to July 3, 2007, when it first learned with certainty that Huntsman was seeking a defense. OneBeacon asserts that an insurer cannot be liable for defense costs until the insured formally "asks" for a defense.4 The Court disagrees.

Idaho law does not require a formal tender of the defense—at least, not in the way OneBeacon believes it does. In Idaho, "[t]he terms of an insurance contract dictate the obligations of the parties." *Pintlar*, 948 F.2d at 1513. The pre-1967 policies contain the following provisions:

10. Notice of Claim or Suit. If claim is made or suit is brought against the insured,

---

4 OneBeacon never explains the difference between a "tender" of a defense and a mere "notice" of an underlying claim. For example, assume an insured mailed its insurer a letter stating that "we, the insured, hereby submit the following claim notification." Is there a difference between that and "we, the insured, hereby submit the following claim?" Or what about, "we, the insured, hereby tender the following claim notification?" Or "we, the insured, hereby tender the following claim. We have hired Graham & Dunn to represent?" It seems that OneBeacon is asking the Court to hold that none of the above statements can constitute "tender" because none of them ask, beyond a shadow of a doubt, for a defense. OneBeacon offers no support for such an extreme position.

> the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.
>
> . . .
>
> 12. Action Against Company. No action shall lie against the company unless, as a condition precedent, thereto, the insured shall have fully complied with all the terms of this policy, not until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant, and the company.

(ECF 42-15, Ex. 5, 5.) The post-1966 policies are identical in all material respects. (ECF 42-25, Ex. 5, 4.) Under the provisions set forth above, an action against OneBeacon for defense costs shall lie when (1) a legal duty to defend Huntsman existed and (2) Huntsman had "fully complied with all the terms" of the policies.

The Court finds that there is a genuine dispute of material fact as to when Huntsman "fully complied" with the terms of the policy. Though OneBeacon does not explicitly raise a "late notice" defense, the gravamen of its position is that Huntsman failed to provide sufficient notice of the underlying claim. (ECF 47, Defs.' Mem. of Points and Authorities in Opp'n to Pl.'s Mot. for Partial Summ. J. 11, 14.) Strict compliance with the notice provision set forth above would require the immediate forwarding of the underlying suit papers to the insured. Huntsman did not forward any notice until a year after receiving the Forest Service's PRP letter. Huntsman also failed to forward the PRP letter until August, 2007.

Idaho law does not, however, require strict compliance with notice provisions made condition precedent to a suit against an insurance provider. Substantial compliance suffices.

14

*Viani v. Aetna Ins. Co.*, 501 P.2d 706, 714 (Idaho 1972). In *Viani*, the Supreme Court of Idaho held that the failure to substantially comply with a notice provision made a condition precedent to recovery releases the insured from its obligation to defend. *Id.* The court commented that this rule "allows the insured opportunity to offer various excuses for non-compliance as well as a factual determination as to whether notice was given 'as soon as practical' or 'immediately' depending on the specific language of the condition." *Id.* The court further explained that "there is flexibility built into the rule which allows for substantial performance of the condition." *Id.* *See also County of Kootenai v. Western Cas. and Sur. Co.*, 750 P.2d 87, 88-92 (Idaho 1988) (reversing summary judgment in favor of insurer because insured substantially complied with notice provision); *Leach v. Famer's Auto. Interinsurance Exch.*, 213 P.2d 920, 923 (Idaho 1950) (finding substantial compliance when insured provided delayed, oral notice rather than immediate, written notice); and *Berg v. Assoc. Employers' Reciprocal*, 279 P. 627 (Idaho 1929) ("At least a reasonable or substantial compliance with the provisions of the [insurance] contract relating to the furnishing of the information therein required is a condition precedent to the maintenance of any action [under the contract.]").

Although it is a close call, the Court finds that there is a question of fact as to whether, and when, Huntsman substantially complied with the terms of the policies at issue. "As with other issues dealing with the provision of notice, the question of the sufficiency of the notice is ordinarily a question of fact for the jury." 13 COUCH ON INS. § 186.18 (2011). Notice must be sufficient to allow OneBeacon "to evaluate the claims and determine whether an arguable

15

potential exists for a claim covered by the policy." *See State of Idaho v. Bunker Hill Co.*, 647

F.Supp. 1064, 1068 (D. Idaho 1986).5

A reasonable jury could determine that the January 21, 2005 letter would be insufficient

to allow OneBeacon to determine whether an arguable potential exists for a claim covered by the

policy. The Forest Service's PRP letter identified the dates it alleged Huntsman's predecessor

operated the North Maybe Mine. The January 21 letter did not. The PRP letter identified the

principle element of environmental contamination. The January 21 letter did not. The PRP letter

also set out with specificity what actions Huntsman was expected to take in the immediate future.

(ECF 42-30, Decl. Jay Spillet, Ex. 8, 1-2.) The January 21letter did not. A jury could find that

without the entirety of the information contained in the PRP letter—the dates in

particular—OneBeacon could not make a reasoned determination of whether a potential for

liability existed.

Even if it was beyond genuine dispute that Huntsman complied with the notice provision,

two genuine disputes of material fact remain. First, in light of the parties past conduct, a

reasonable jury could conclude that Huntsman waived its right to defense costs prior to the

---

5 The literal language of the policies required Huntsman to forward the Forest Service's PRP
letter. It did not. The policies also required Huntsman to immediately forward all underlying
papers it received. Yet it did not forward the Forest Service letter until 2007. It also failed to
forward anything at all until a year after the being designated a PRP. OneBeacon made it very
clear, however, it was not raising noncompliance with the notice provision as a defense. (ECF
47, Defs.' Mem. of Points and Authorities in Opp'n to Pl.'s Mot. for Partial Summ. J. 11.)
Instead, it argued that Huntsman failed to meet its company-held standard for tender—a specific
request for a defense.

summer of 2007.

A waiver of a contractual right is a voluntary, intentional relinquishment of a known right or advantage. *Knipe Land Co. v. Robertson*, ___ P.3d ___, 2011 WL 2039635 (Idaho 2011) (quoting *Fullerton v. Griswola*, 136 P.3d 291, 295 (Idaho 2006)). The party advancing the theory must demonstrate that the party who is to have waived its right did so with a clear and unequivocal act manifesting a true intent to waive. *Id.* (citing *Margaret H. Wayne Trust v. Lipsky*, 846 P.2d 904, 907 (Idaho 1993) and *Seaport Citizens Bank v. Dippel*, 735 P.2d 1047, 1050 (Idaho Ct. App. 1987)).

Here, Huntsman retained Graham & Dunn before it sent the January 21, 2005 letter to OneBeacon. It hired CH2MHILL before it had determined with certainty OneBeacon would reimburse its defense. Between the January 21 letter and Jay Spillet's May 11, 2007 phone call to OneBeacon, twenty-seven and one half months past. During this time there was no communication between the parties regarding the claim. Huntsman engaged in settlement negotiations with other potentially responsible parties. (ECF 54, Decl. Evelyn Riley, Ex. 9.) Huntsman spent $275,261.45 on legal and consulting fees. (ECF 42-3, Ex. 2, 4.) It is unfathomable that a sophisticated company would spend over a quarter million dollars under the assumption—assumption—that its insurance company would later step in and foot the bill.

Huntsman's past conduct might also support a finding of wavier. Attached to the declaration of Evelyn Riley are a number of letters extremely similar to the July 21, 2005 letter. The other letters identify other claims brought against Huntsman by third-parties. (ECF 54, Decl.

17

Evelyn Riley, Ex. 2-7.) They also identify the law firm Huntsman retained to represented them in those actions. While the record before the Court does not reveal the ultimate outcome of these claims, the fact that Huntsman routinely provided its own defense lends credence to the argument that Huntsman waived its right to defense costs in this case. At the least, there is a factual dispute as to waiver that must be resolved by the jury.

The final genuine dispute of material fact relates to the policies' "voluntary payment" provisions. Those provisions state that "[t]he insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense" other those required to render aid to an accident victim.[6] Identical provisions have been held to bar an insured from recovering defense costs incurred before the insurer denied coverage. *See, e.g., Research Corp. v. Westport Ins. Corp.*, 289 Fed.Appx. 989, 994 (9th Cir. 2008) (holding district court erred in awarding pre-tender damages because insured's payment of fees violated voluntary payment provision and denied insurer right to assign counsel and avoid what it considered to be unreasonable attorney fees) (unpublished) (applying Arizona law); *Faust v. The Travelers*, 55 F.3d 471, 472-73 (9th Cir. 1995) (holding that voluntary payment provisions "provide[] only that an insurer will not be held liable for expenses voluntarily incurred by an insured before tendering defense of a suit to the insurer") (applying California law); *Northern Ins. Co. of New York v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1360 (9th Cir. 1992) (applying Washington law).

---

6  (ECF 54 & 55, Decl. Evelyn Riley, Ex. 17, 2 (1965 Policy); Ex. 18, 3 (1966 Policy); Ex. 19, 5 (1968 Policy); Ex. 20.)

Obviously, it is possible some of the costs incurred by Huntsman were incurred out of necessity and before OneBeacon could have made a coverage determination. If this is the case, Huntsman would have the right to have those costs reimbursed. *Northern Ins. Co. of New York v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1360 (9th Cir. 1992) (applying Washington law). There is no evidence in the record, however, that can shed light on this issue. It must be resolved by a jury.

### Huntsman's Motion for Partial Summary Judgment – Pro Rata or Joint and Several Allocation

The parties urge the Court to decide whether and how the costs of this case (both defense and indemnity) should be allocated among the parties. OneBeacon urges the Court to hold that Idaho would adopt the "pro rata" theory of allocation. Under that theory, costs are allocated based on what company was providing coverage at the time of the accident or based on the "time on the risk." Huntsman urges the Court to hold that Idaho would likely adopt the "joint and several" approach. Under this approach, any insurance company that issued a policy under which there is coverage is jointly and severally liable for the entire cost of defense and indemnification. It is then up to that company to seek contribution from others.

Having considered the authorities cited by the parties, *Boston Gas Co. v. Century Indemnity Co.*, 910 N.E. 290 (Mass. 2009), and *Sharon Steel Corp. v. Aetna Cas. and Sur. Co.*, 931 P.2d 127 (Utah 1997), in particular, the Court believes Idaho is likely to adopt the pro rata approach. A "growing plurality" of states have already done so, recognizing the logic and

19

fairness inherent the approach. For one thing, no reasonable policy holder would expect that a single, one-year policy could cover all losses caused by decades of environmental contamination. It is equally unlikely that any reasonable policy holder would expect an insurer that issued one, single-year policy could be liable for defending an incredibly complex mass tort claim.

The pro rata approach has practical benefits, too. It eliminates an insurer's incentive to lay low and force another company to step into the breach. It also conserves judicial resources. The practical result of both approaches is an equitable allocation of costs. The joint and several approach just takes longer. There is no reason to require an extra proceeding when it is possible to just cut to the chase.

Despite its belief in wisdom of the pro rata approach, the Court declines to hold that Idaho is likely to adopt the pro rata approach. Issues that have yet to be resolved—both those set out above and those wrapped up in the indemnity claim—will play a significant role in determining the rights and obligations of the parties as they relate to defense costs. (For example, if there is ultimately no coverage at all the issue shifts from allocation to recoupment.) Because this case must be reassigned to a new District Court Judge, the Court is unwilling to decide the law of the case as it relates to allocation. The Court sees no reason to bind the hands of the trial judge going forward.

## CONCLUSION

OneBeacon disclaims all responsibility for losing Huntsman's claim notification letter and refuses to fulfill its contractual obligations. Huntsman ignored its contractual obligations and

assumed its own defense, which it continued for some twenty-seven months without so much as

an email to OneBeacon. It appears as though the proper outcome is somewhere between these

two extremes. A jury will find it.

THEREFORE, IT IS ORDERED that OneBeacon's Motion for Summary Judgment is

DENIED.

IT IS FURTHER ORDERED that OneBeacon's motion to certify questions is denied.

IT IS FURTHER ORDERED that Huntsman's Motion for Summary Judgment is

GRANTED in part and DENIED in part. It is granted as to the duty to defend, which the

Court finds began on February 27, 2004 and will continue until there is a determination

of no coverage. It is denied as to the issue of defense costs.

IT IS SO ORDERED.

DATED this _____21ˢᵗ_____ day of July, 2011.


William F. Heavener

United States District Judge